REDMANN, Judge.
Plaintiff’s low bid of $238,265 brought it a contract for a four-mile levee enlargement along Bayou Gauche and related work for defendant Board. The plans and specifications were prepared and construction was supervised by defendant state Department of Public Works under the direction of defendant engineer Alfred E. Simpson. Plaintiff now appeals from the dismissal on the merits of its demands against those three defendants for the substantial losses, both direct and consequential, it suffered in performing the contract.
The question is whether those losses are recoverable either from the Board, partly under the contract as written and partly as’ plaintiff would have it reformed, or from Public Works and Simpson, by their fault in design and in punitive supervision of performance of the contract work.
Plaintiff attributes most of the losses to being misled by Public Works’ “typical” levee cross-sections in the documents on which plaintiff bid and to being obliged to use humus and organic clay in the construction. The “typical” cross-sections, by grid lines marked in feet, suggested distances from borrow pit to levee that were not typical but substantially shorter than the actual distances that fill had to be moved, notwithstanding that the cross-sections also placed the pit at “minimum” ten feet from right-of-way line and noted “right-of-way varies.” The humus, because of its instability and greater shrinkage (compared to non-humus soil), required a significant overbuilding beyond design measurements of the levee, plaintiff contends, and further added to production costs because' “our construction equipment could not stand up on it.”
The losses claimed are substantial. Maximum distances from borrow pit to levee averaged, plaintiff says, 47% greater than the distances suggested by the typical cross-sections, and plaintiff seeks both an increase of 47% ($46,295) over its original cost estimate as well as the apparently duplica-tive items of $13,975 for the costs of moving the fill-moving machines and the mats upon which they sat from side to side and $13,409 for double handling of fill in some areas where two machines were required. The humus fill required overbuilding to allow for shrinkage far beyond the quantity estimated by plaintiff in its bid calculations, plaintiff contends, increasing costs both by the extra work in overbuilding and then in removing the excess overbuild as required by Public Works notwithstanding that the contract did not expressly prohibit final overbuild. The humus also necessitated the use of lighter, less productive equipment, as in dressing the surface of the levee. The total claimed for these items is $128,391, and another $7,141 is claimed for attempts to repair slides, or levee failures, attributed to the use of humus. A related claim is $7,502 for subsidence fill which defendants rejected because some subsidence plates could not be found. Delays occasioned by the main problems described produce claims for $13,900 withheld as liquidated damages and for increased costs of $33,040 for the shell road at the landside toe of the levee and $3,983 for fertilizing and seeding the levee. The record fairly establishes that plaintiff did lose money on this contract; an independent accountant placed direct costs at about $200,000 more than the con *788 tract price (although defendants’ evidence suggests other explanations for plaintiff’s cost overruns). Indirect cost or loss to plaintiff resulted from its reduced working capital and thus reduced bonding capacity and consequent inability to bid on jobs of the size it proved it had profitably performed in the past.' For this indirect loss plaintiff claims $250,000.
TYPICAL SECTIONS
There is no gainsaying that the typical vertical-plane sections, drawn on a scale of 1" to 10' and each relating to conditions over hundreds or thousands of feet of levee right-of-way, at times underrepresent the distance from the land side of the borrow pit to the water side of the levee. But the sections do note “right of way varies” between arrows indicating total right of way. The reasonable person would interpret the cautionary “right-of-way varies” as indicating that the actual distances would be in some cases more and in some less, with a “typical” representation constituting a middle ground though not necessarily an average. Often, as between stations 154 + 00 and 180 + 00, actual ground distances— there 185' to 223' — -at every point exceeded the “typical” section distance — there 175' (compared to an actual average of 192'). At another point, station 102 + 00, the actual distance was 229' and the “typical” section’s distance was 130'. That typical section, however, applied to the 8,400' from station 25 + 00 to station 109 + 00, and, in addition to the note “right of way varies,” the great distance covered might suggest a wide variation in right-of-way widths because of changing watercourse and levee placement — a variation confirmed by the horizontal-plane plans (scaled 1" to 100') which were also part of the documents upon which bids were based. (The problem with the plans is that they did not clearly indicate the waterside toe of the levee, but only the “base line” which was at times within the enlargement work and at times not. The only source of accurate measure at each 100' station was field notes and actual sections that Public Works had and that were available to bidders’ inspection.)
The “typical” sections’ underrepresentation of distances as described does not, however, justify any bidder’s reliance on short distances in selecting boom length for fill-moving equipment such as a dragline. The bidder needs to know maximum rather than average (or “typical”) distance; he can swing his longer boom through less than 180° for shorter distances but he cannot increase the reach of a short boom. We therefore reject claims for having to move equipment and mats laterally and for double handling of fill at the longest distances.
The bidder might reasonably utilize “typical” distances (if that meant “average” distances) to estimate the total time appropriate equipment would require to move the fill from borrow pit to levee. But it appears to us facially unreasonable that plaintiff’s cost of and entitlement to pay for moving fill a horizontal distance of 147' could be 47% more than that of moving fill 100'. Plaintiff cited nothing other than the basic formula work equals force times distance, which proves nothing except that that presumably minor fraction of the work necessary to overcome the resistance of friction in the boom’s rotating is greater over a longer swing; the work in digging and lifting out the fill, in beginning and braking its horizontal movement from pit to levee, and in lowering it into place all presumably remain the same. Thus loss attributed by plaintiff to understatement of “typical” distances is not established by plaintiff’s 47% formula. Nor is it established by plaintiff’s records of costs because those included the costs of considerable unnecessary overbuild and lesser matters such as time lost by equipment failure.
The record thus supports the trial judge’s rejection of the claims based on the typical cross-sections.
SOIL CONDITIONS
Public Works had, but disregarded, a recommendation from independent soil engineers that humus and organic clay not be used in the construction of the levee. The specifications called for no waste of borrow *789 pit material and on one occasion when plaintiff left humus on the berm Public Works required its removal and use in the levee.
Plaintiff complains that the humus obliged it to overbuild (to compensate for shrinkage) more than it had estimated; gave insufficient support to the heavy, high-production equipment it planned to use, forcing substitution of lighter, less productive equipment; and was unsuitable to the three-to-one slope design of the levee, making it unstable and causing slides and failures.
The record supports the trial judge’s rejection of these charges. The soil engineers did not testify and their report is not in evidence. What is in evidence is that south Louisiana soil is high in humus content, yet even larger levees have been built with soil containing humus and have not failed. At least one independent expert, with many years experience in the U.S. Corps of Engineers, “concurfred] fully in the finding of the design engineer that it was impractical on an economic and actual basis to separate the humus material from the silts and clay.”
Defendants also note that the documents bid upon required the bidder “to examine carefully the site of the proposed work, proposal, plans, specifications, and contract . and it will be assumed that he has investigated and satisfied himself as to the conditions to be encountered . . ■. Plaintiff does not excuse itself from this obligation and from the consequent presumed knowledge that a prudent bidder would have. Defendants presented evidence that even plaintiff’s heaviest equipment did not bog down. They also presented evidence of certain violations of contract requirements such as that fill be dropped in place from not further than two feet away, which could have caused some sliding of fill (but was not the cause of failures because defendants have excused plaintiff from further attempt at remedying the three failures experienced from land faults).
We disagree with the trial judge only on the issue of pay for subsidence demonstrated by subsidence plates. The plates are steel, two feet square, and are set in place every 200 feet prior to beginning construction (a condition of the contractual right to pay for any necessary extra fill). After construction the plates are located by rods and the added volume needed to keep the levee as high as designed is then calculated and paid on the bid price per cubic yard. Defendants declined to approve and pay some subsidence because 34 of the 93 plates could not be located under the levee upon final inspection on January 24, 1977, although they were set in place and had been located, showing subsidence, on a preliminary inspection on October 27, 1976. Defendants paid $6,765 for subsidence over the 59 plates found. Defendants’ project engineer testified “Certainly I think there was subsidence” at the areas the plates were not found, and “I see no reason to doubt” that the subsidence where plates were missing was comparable to that at nearby plates. His calculations would allow $3,898 ($10,663 -6,765) for similar subsidence on the other 34 plates, but he refused to approve the expenditure of public funds because the contractor had the contractual obligation to prove the amount by finding the plates. The engineer’s attitude is most commendable, but our interpretation of the contract requirement is that its purpose is satisfied by a locating of the plates on a preliminary inspection and thereafter the public fisc and the engineer’s own integrity are protected by the circumstance that reasonable uniformity of soil conditions justifies averaging the unlocated plates with the located plates. We therefore award this amount.
On the issue of the removal of the overbuild, we note that general specification 3.58 provides that material placed “elsewhere than in places designated on the drawing . . . the contractor may be required to remove . . . .” Some experts explained that overbuild could cause instability problems and we cannot say— notwithstanding the lack of any expressed tolerances in the specifications, such as the six inches the engineers imposed — that defendants exceeded their contractual rights in requiring removal of some of the overbuild.
*790 The other claims resulting from delays in performance are not recoverable because the delay is not attributable to defendants.
The Judgment appealed from is reversed in part and there is judgment for plaintiff against the Board of Commissioners for the Lafourche Basin Levee District for $3,898 with legal interest from January 24, 1977, and half of all costs; and it is in other respects affirmed.